## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 28 2017, 5:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patrick J. O'Connell
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

Kevin J. Riley
James R. Schrier
Reiling Teder & Schrier, LLC
Lafayette, Indiana

Edward Chosnek
Chosnek Law P.C.
Lafayette, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Estate of John L. Thompson, Sr.:

Sandra Riggs,

*Appellant-Defendant,*

v.

Marcee L. Brody and John L. Thompson, Jr.,

*Appellees-Plaintiffs.*

June 28, 2017

Court of Appeals Case No. 79A02-1606-ES-1329

Appeal from the Tippecanoe Circuit Court

The Honorable Thomas H. Busch, Judge

Trial Court Cause No. 79C01-1402-ES-6

**Kirsch, Judge.**

[1] Sandra Riggs ("Riggs") appeals the jury's verdict, which set aside the will of John L. Thompson, Sr. ("Senior") and assessed monetary damages against Riggs and in favor of her siblings, Marcee L. Brody ("Brody") and John L. Thompson, Jr. ("Junior"). Riggs raises several issues, of which we find the following dispositive: whether the trial court abused its discretion when it excluded testimony regarding Senior's testamentary intent as a sanction for the violation of a motion in limine.

[2] We reverse and remand.

## Facts and Procedural History

[3] Junior, Brody, and Riggs are the children of Barbara Thompson ("Barbara") and Senior, who divorced in 1970 when the children were still young. In 1972, Senior moved in with his girlfriend, Barb Fields ("Fields"), and they lived together on property in Lafayette, Indiana ("the Eisenhower property") until 2013. Junior lived with Senior at various times during his childhood, while Brody and Riggs lived with Barbara during their childhoods.

[4] Junior testified that he had a good relationship with Senior, that he loved his father, and that he believed that his father loved him. *Tr. Vol. III* at 8, 78. Junior also admitted that there was "friction" in his relationship with Senior. *Id.* at 62. In June 1985, when Junior was about nineteen years old, a fight occurred between Junior and Senior, in which Junior got drunk and went to Senior's home in the middle of the night and assaulted Senior. *Tr. Vol. I* at 100-01; *Tr. Vol. III* at 8; *Def't's Ex.* A. This incident related to a statement that

Senior had made to Barbara at a child support hearing that Senior did not believe that Junior was his child. *Tr. Vol. I* at 102; *Tr. Vol. II* at 6; *Tr. Vol. III* at 8. Junior and Senior later reconciled, and Senior acknowledged to Junior that Junior was his son. *Tr. Vol. III* at 11.

[5] Brody did not have a close relationship with Senior during her childhood and for many of her adult years. One of the reasons for the conflict between Brody and Senior was that Senior did not approve of Brody's decision to join the military after high school. From around 1996 until 2000, Brody visited Senior occasionally, but stopped making an effort to see him after 2000 because she felt Senior was not putting forth any effort into their relationship. Riggs testified that she had a good relationship with Senior and had regular contact with him her entire life. *Tr. Vol. IV* at 44-46.

[6] Senior retired in 1993 after he suffered a heart attack, at which time he had open heart surgery, and Fields took care of him. From 1993 until 2007, Senior's only income was from disability payments and pension. In March 1996, Senior opened a checking account with Regions Bank and named Riggs, Brody, and Junior as equal beneficiaries under the account. Senior deposited most of his disability and pension payments into this account. On August 14, 2007, Senior opened an annuity with Pacific Life Insurance Company ("the Annuity") and named Riggs, Brody, and Junior as equal beneficiaries under the Annuity. Riggs, Brody, and Junior remained equal beneficiaries until December 6, 2013.

[7] In 2011 or 2012, Fields and Senior discussed giving a portion of the Eisenhower property to Junior. Fields testified that paperwork was drawn up to transfer the property, but Senior changed his mind in July 2012. *Tr. Vol. I* at 50. At some point, Riggs and Junior discovered that Fields was on the deed to the Eisenhower property as Senior's wife under the name Barbara L. Thompson. In June 2013, Riggs prepared a quitclaim deed in order to transfer Fields's interest in the Eisenhower property to Senior, and Fields signed the quitclaim deed.

[8] Senior suffered a stroke in May 2013, and Fields cared for him after the stroke. Fields took Senior to a neurologist who diagnosed Senior with short-term memory loss likely due to early dementia. Fields told the children about Senior's stroke in June 2013. Shortly after learning about Senior's stroke, Riggs prepared a Durable Power of Attorney ("POA"), which named Riggs as Senior's POA. On August 19, 2013, Riggs and Brody took Senior to another appointment with the neurologist, and at that time, the doctor diagnosed Senior with advanced dementia; however, the doctor later admitted he may have overestimated the degree of dementia that Senior suffered. *Appellee's App. Vol. IV* at 50.

[9] On August 9, 2013, Riggs took Senior to Regions Bank to meet with the assistant manager, Susan Randall ("Randall"). Randall testified that Senior had previously met with her a few months prior because he wanted to withdraw all of his money from his checking account to keep it safe from Fields. *Tr. Vol. III* at 198-99. On August 9, Senior was still concerned about keeping his money

safe from Fields, so Randall recommended that Senior transfer the money to an account opened in Riggs's name. Randall testified that Senior chose this option, and the sum of $200,000 was transferred from the account into a new account owned solely by Riggs. *Id*. at 210. In October 2013, Senior and Riggs went to First Source Bank and opened an account in Riggs's name, and transferred the money from the Regions Bank account into the new account.

[10] Senior began living with Riggs in September 2013. In December 2013, Senior and Riggs went to the office of Roger Bennett ("Bennett") in order to make a will for Senior. Bennett spoke with Senior privately to determine Senior's testamentary capacity and who he wanted to leave his estate to. *Tr. Vol. III* at 163, 166. Bennett believed that Senior had sufficient testamentary capacity to execute a will. *Id*. at 166. Bennett testified that Senior expressed his intent to leave his property to Riggs and not to Brody or Junior because they did not "care enough about him to come visit regularly." *Id*. at 166-67. Bennett prepared the will, and a few days later, Senior and Riggs came back to have Senior sign the will. When Bennett reviewed the will with Senior and Riggs, Riggs objected when she found out that Senior was leaving everything to her and stated that Senior was "going to make trouble for [Riggs] with [Junior and Brody]." *Id*. at 172. Senior then stated that Junior and Brody "didn't give a damn about him," but decided to leave them $2,000 each. *Id*. Revisions were made to the will to reflect this change, and Senior signed the will. After the will was signed, Riggs and Senior went to First Source Bank and Senior changed the beneficiaries of the Annuity from Junior, Brody, and Riggs to only Riggs.

Senior died January 10, 2014. On February 7, 2014, Senior's will was admitted to probate, and Riggs was named personal representative of the estate. Junior and Brody filed a complaint to contest Senior's will on March 5, 2014. Junior and Brody filed motions in limine, in which they sought to exclude evidence of Junior's alleged alcoholism, his criminal record, and that Junior was not Senior's biological son. In an order entered on May 19, 2016, the trial court granted the motions in limine, ordering in pertinent part:

> The alcoholism of [Junior] may not be discussed in the presence of the jury until further order of this Court. . . . The parties may not discuss [Junior's] criminal record until further order of the Court. . . . Evidence concerning [Senior's] belief or statements that [Junior] was not a natural child of [Senior] may not be discussed in the presence of the jury until further order of the Court.

*Appellee's App. Vol. II* at 77.

A jury trial was held from May 24, 2016 through May 27, 2016. On the first day of trial, after a discussion on the issue of character evidence, the trial court stated:

> So proving generally that [Junior and Brody] are not of good character would not be competent evidence but proving that they were considered by the testator to be of bad character or unworthy would be relevant and competent. So just the fact for instance [Junior] had a drinking problem would not be relevant but if there were instances in which this was a matter of friction between him and his father that would be relevant.

*Tr. Vol. I* at 5. Riggs's counsel asked for clarification regarding the status of the motions in limine as to evidence of Junior's alcohol use and criminal record, and the following exchange occurred:

> [Trial Court]: [Evidence related to Junior's alcohol use and criminal record] can only come in if it effects [sic] the mind of the father. The fact that they are a bad character can't come in on that basis but if they had --
>
> [Riggs's Counsel]: If he went to visit his son in the prison is that admissible?
>
> [Junior and Brody's Counsel]: I think that's more harmful, more prejudicial than probative of any evidence.
>
> [Trial Court]: If he was angry at his son for being a drunk that would come in. If they -- the two of them got into quarrels and fought that would come in. But just the fact that any of the three people -- well any of the -- either of the plaintiffs are bad character doesn't come in just for that reason. So I don't think that his convictions come in except as they -- but the incident--as I understand it one of the incidents where the police report was made was one where there was friction between the son and father. That would certainly come in.

*Id*. at 11-12. The trial court also stated that evidence of whether Junior was or was not the biological son of Senior should be allowed only as it related to Senior's soundness of mind and the issue of undue influence. *Id*. at 6. Included in the evidence the trial court was going to permit were statements that Senior allegedly made to Riggs in the car after he signed the will. *Id*. at 14.

[13] During Riggs's testimony on the final day of trial, she referenced Junior's criminal record in response to a question about whether Senior gave her an explanation for giving unequal shares to the children in his will. *Tr. Vol. IV* at 147-48. Counsel representing Junior and Brody objected, and a sidebar conference was held. At the conclusion of the sidebar, the trial court struck the answer and instructed the jury to "disregard the question and answer and further . . . to . . . assume that no explanation was given by [Senior] at that time or subsequently." *Id*. at 150. At the end of the trial, the jury found (1) the will to be invalid, (2) the withdrawal from the Regions Bank account on August 9, 2013 to be invalid, (3) the change of the beneficiaries of the Annuity from Junior, Brody, and Riggs to just Riggs only and the corresponding death payment to Riggs to be invalid, and (4) as a result, that Riggs is liable to Junior and to Brody in the amount of $133,334.06 each. Riggs now appeals.

## Discussion and Decision

[14] Riggs argues that the trial court erred in its imposition, as a sanction for violating the motions in limine, of the exclusion of her testimony regarding statements Senior made to her after signing the will. A party who violates an order in limine may not do so with impunity. *Allied Prop. and Cas. Ins. Co. v. Good*, 919 N.E.2d 144, 151 (Ind. Ct. App. 2009), *trans. denied*. The sanction for violating an order in limine is "within the discretion of the trial court and under appropriate circumstances might extend to declaration of a mistrial and/or punishment for contempt." *Id.*

[15] Riggs contends that the trial court erred when it excluded any testimony of what Senior told her regarding his intent in writing his will. She asserts that the central issue at trial was determining Senior's testamentary intent and that the trial court's action in excluding her testimony meant that the jury was given no basis to evaluate the issue. Riggs claims that the trial court's sanction for her violation of the motions in limine denied her due process because it excluded testimony concerning anything that Senior said at the time he signed his will or immediately thereafter and "virtually eliminated [her] legal ability to prove her case." *Reply Br.* at 14. She maintains that the trial court's sanction was an excessive punishment for violation of the motions in limine and should be found to be an abuse of discretion. We agree.

[16] Here, the trial court granted the motions in limine to exclude evidence of Junior's criminal record. During her testimony on the last day of the trial in response to a question as to whether Senior said anything to her when they were leaving Bennett's office to explain his will, Riggs stated, "Yes, he said he was very embarrassed for many years of [J]unior's criminal record." *Tr. Vol. IV* at 148. Counsel for Junior and Brody immediately objected, and the trial court told the jury to disregard the question. *Id.* After a sidebar conference, the trial court instructed the jury to "disregard the question and answer and further . . . to . . . assume that no explanation was given by [Senior] at that time or subsequently." *Id.* at 150.

[17] Therefore, as a sanction for violating the motions in limine, the trial court excluded any of Riggs's testimony regarding what Senior said to her in

explanation as to why he wrote his will to essentially exclude Junior and Brody and also instructed the jury to assume that Senior gave no explanation, either as he left Bennett's office or at any time thereafter, concerning why he wrote his will in that manner. This sanction essentially excluded all of Riggs's evidence supporting her defense as to Senior's intent in writing his will. Although the trial court has discretion in crafting a sanction for the violation of a motions in limine, the sanction imposed by the trial court in the present case was severe and deprived the jury of hearing evidence that was necessary for it to consider in order to properly decide the case. Other less severe sanctions were available for the trial court to utilize, including striking the offending testimony, an admonishment to the jury to disregard the testimony, a curative instruction, or punishment for contempt. Further, in excluding evidence, the trial court instructed the jury to assume that Senior never gave an explanation as to his intent in writing his will, and then, gave a final instruction that stated, "If a party fails to testify about facts, produce a witness or produce documents under the party's exclusive knowledge and control, you may conclude that the testimony the witness could have given . . . would have been unfavorable to the party's case." *Appellant's App*. at 36. We conclude that the trial court abused its discretion in its choice of sanction for the violation of the motions in limine. We, therefore, reverse the jury verdict and remand for retrial.

[18] Reversed and remanded.

[19] Mathias, J., and Altice, J., concur.